**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 69 Civ. 200 (DNE).**

United States District Court, S. D. New York.

March 17, 1977.

U. S. Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Cravath, Swaine & Moore, New York City, for defendant.

Eaton, Van Winkle, Greenspoon & Grutman, New York City, for respondent.

## MEMORANDUM

EDELSTEIN, Chief Judge:

Defendant in this civil antitrust case, International Business Machines Corporation, has moved this court for an order compelling compliance by Gary B. Friedman and Itel Corporation with a subpoena duces tecum and ad testificandum served August 14, 1975 as to documents dated, written, or created after December 31, 1974. In addition to IBM's moving papers, the court has before it the response papers submitted on behalf of Itel and Mr. Friedman, a memorandum and affidavits submitted by the government with leave of the court, and additional affidavits requested by the court following the oral argument upon this motion on February 18, 1977.

Gary B. Friedman left IBM in 1967 to co-found Itel Corporation, a company in the electronic data processing industry. He is currently Executive Vice President and Vice Chairman of the Board of Itel and is now designated as one of plaintiff's trial witnesses. IBM contends that certain post-1974 documents have been withheld from production by Itel on confidentiality

---

grounds and that those documents are relevant to Mr. Friedman's anticipated direct testimony. IBM further contends that Itel has been dilatory, that IBM has exerted substantial effort to minimize Itel's inconvenience and expense, and that any remaining burden upon Itel and distrust by Itel of the protection afforded to allegedly confidential documents by a protective order in this case [1] do not warrant a denial of IBM's motion.

According to its papers in response, Itel has already extensively responded to the IBM subpoena at great cost and inconvenience, and IBM has never sufficiently demonstrated its entitlement to the documents which are the subject of the instant motion. Further, if IBM is granted any further discovery, the court should afford protection to five categories of post-1974 documents which are commercially sensitive [2] beyond that contained in Amended Pretrial Order No. 13 in this case "in view of the potentially inordinate risk Itel would then be required to bear in the interests of aiding its competitor IBM." [3]

The court notes at this point that it is unclear from the papers and the record of the oral argument whether Itel has withheld from production post-1974 documents which are not within the five categories of documents which Itel claims contain highly sensitive confidential information. Counsel for Itel and Mr. Friedman, however, has conceded that its opposition to this motion is only as to those categories.[4] To the extent, therefore, that Itel has withheld post-1974 documents not in those five categories the court expects prompt production to IBM and so directs counsel.

In addition to the arguments mentioned above, Itel asserts that IBM's motion is "unreasonable, overly searching and is made in bad faith since its effect (by design or otherwise) is to harass, oppress and intimidate Mr. Friedman and Itel. . . ." [5] In its memorandum Itel bases this assertion upon the timing of the IBM motion and the extent of the production already made by Itel.[6]

Although not referred to in its memorandum, assertions by Itel contained in the affidavit of its counsel raise a serious question about the good faith of IBM's discovery demands from Itel and the propriety of certain conduct by counsel for IBM. Neither the fact that Itel does not rely on these assertions as an explicit basis for its opposition to IBM's motion nor the fact that the assertions concern actions taking place after the filing of this motion dissuades the court from considering them in its evaluation of IBM's motion.

According to the affidavit of counsel for Itel, counsel for Itel and for IBM discussed the possibility of reaching a compromise after the filing of the instant motion. Itel offered to IBM "a proposed stipulation conceding the conceptual basis for the general facts concerning Itel's recent activities, withholding only the particular details of contracts and other specific data necessary for Itel's survival." [7] IBM found the offer unsatisfactory. Counsel for Itel then asked counsel for IBM to appreciate Itel's wariness concerning the disclosure of certain information, implored him to relent, and suggested that Itel had been and was continuing to be "oppressed and harassed unreasonably." [8] Itel counsel's affidavit continues:

> While he [IBM counsel] did not concede to my characterization, he did say that if Mr. Friedman and Itel would stipulate that IBM had not violated the anti-trust laws, IBM would be pleased to leave Mr.

**1.** Amended Pretrial Order No. 13, filed June 25, 1975.

**2.** See Affidavit of Gary B. Friedman ¶ 8; Affidavit of Herman H. Howerton (submitted with Itel's Memorandum in Opposition) ¶ 2.

**3.** Memorandum in Opposition at 3.

**4.** Tr. of Feb. 18, 1977 at 40415.

**5.** Memorandum in Opposition at 2.

**6.** *Id.* at 3.

**7.** Affidavit of Norman Roy Grutman ¶ 11.

**8.** *Id.* at ¶ 12.

Friedman and Itel alone. He then reiterated that IBM's amorphous "needs" for the materials related to the requirements of cross examination, and he added that, of course, if Mr. Friedman did not testify adversely to IBM, or did not testify at all, the whole issue could be obviated.[9]

Following the filing of the Itel papers, the government sought permission to file a memorandum with respect to this motion in part "because of its concern with the implications of the facts recited in paragraph 12 of the affidavit [of Itel counsel]."[10] After reviewing the content of paragraph 12 and two other instances in which IBM counsel allegedly harassed or intimidated government witnesses, the government's memorandum concludes:

> Should the Court conclude that the indicated expressions of IBM counsel have had, and may continue to have an adverse effect upon the right of the Government to free and untrammeled testimony of witnesses called on its behalf, plaintiff calls upon the Court for appropriate admonition or cautionary instruction, and for a specific showing of need as to any additional document production under subpoena by Mr. Friedman, Itel or any other non-party witness called as part of plaintiff's case.[11]

During oral argument IBM asserted that, in context, the statements recounted in the Itel affidavit were not improper, and that the quoted IBM attorney did at no time "engage in any negotiations seeking to limit or define the nature of Mr. Friedman's tes-timony, nor did he ever attempt to bargain to have Mr. Friedman removed from the witness list."[12] Moreover, IBM offered to the court an affidavit by the attorney in question setting forth the substance of the conversations with Itel counsel.[13]

Counsel for Itel responded by offering affidavits of three attorneys for Itel who had listened to those conversations on a speaker phone, undisputedly with the knowledge of IBM counsel. Counsel for Itel added that he did not mean to impugn the character of the IBM attorney whose statements were at issue, that he respected him, and that any criticism should not be directed to that attorney, but to "the faceless mandarins who are his masters and with whom he consulted during the course of the conversations . . ."[14]

In response to a question by the court, government counsel acknowledged that it was charging IBM's counsel with harassment and intimidation.[15]

Following the completion of the argument on this motion, the court requested the submission of the affidavits offered by counsel in the course of their presentations. Those affidavits differ with respect to the tone, context and specific language of statements made by IBM counsel. The relevant portions of those affidavits are set forth in the margin.[16]

Even if this court were totally to discount the four affidavits submitted on behalf of Itel and adopt the disingenuous version of the conversations contained in the affidavit

9. *Id.*

10. Plaintiff's Memorandum at 1.

11. *Id.* at 5.

12. Tr. of Feb. 18, 1977 at 40406.

13. *Id.* at 40404.

14. *Id.* at 40414–15.

15. *Id.* at 40421.

16. The submitted affidavits were those of (a) the IBM attorney, Max R. Shulman, (b) a member of the firm which is special counsel to Itel, Jewel H. Bjork, (c) Corporate Secretary and Counsel of Itel, Herman H. Howerton, and (d) Associate Counsel and Assistant Secretary of Itel, David N. Kuhn. The relevant portions of their affidavits are:

A. Paragraphs 4–12 of the Affidavit of Max R. Shulman:

4. As to the first statement, on February 1, Mr. Grutman telephoned me from Itel Headquarters in San Francisco and offered, in exchange for IBM's withdrawal of its motion, to stipulate the contents of paragraph 10 of my affidavit of January 7, 1977, submitted in support of that motion. I told Mr. Grutman that I did not understand how that paragraph could form the basis for a stipulation, and I asked him to clarify his suggestion.

5. Mr. Grutman stated that Itel would stipulate that:

(a) Itel has recently introduced new EDP products which are plug compatible to and directly competitive with IBM products;

(b) Itel introduced these products in the belief that they would be profitable, and they are profitable;

(c) Itel believes that these products will continue to be profitable;

(d) Itel plans to continue offering new EDP products competitive with IBM products; and

(e) Itel plans to continue offering such products in the belief that they will be profitable and will enable Itel to capture an increasing share of the EDP market.

6. Mr. Grutman claimed that such a stipulation would embody the "ultimate facts" IBM wanted to establish and would "prove IBM's case for it." In response, I told Mr. Grutman that his proposal was so vague and conclusory that it did not constitute a sound basis for stipulation and that, in any event, I felt the Department of Justice would probably not agree to be or be bound by such a stipulation. I added that his proposal would not establish any "ultimate facts" in this lawsuit since the "ultimate fact" at issue was whether IBM had violated the antitrust laws as claimed by the Department of Justice, and that if Mr. Grutman was interested in stipulating "ultimate facts" in return for IBM's withdrawing its motion, the "ultimate fact" to be proved was that "IBM at no time has violated the antitrust laws."

7. This last statement was not made as a serious proposal for stipulation, and Mr. Grutman knew it. It was merely a way of illustrating the flaw in Mr. Grutman's initial proposal. Both Mr. Grutman and I laughed at it, and neither he nor I believed that we were seriously discussing what would obviously be a completely pointless and nugatory stipulation. The suggestion by plaintiff that I was seriously attempting to arrange such a ridiculous stipulation is false.

8. With regard to the second statement complained about by plaintiff, during conversations I had with Mr. Grutman on February 1 and 2, he expressed concern that information which Itel believed to be highly confidential might be put on the public record when Mr. Friedman testified at trial. Mr. Grutman was reiterating a constant complaint which Itel has made throughout IBM's protracted attempts to obtain adequate discovery, and which is repeated in the affidavits submitted by Itel in opposition to the present motion: that Amended Pretrial Order No. 13 affords nonparties inadequate protection.

[no. ¶ 9 appears in the original]

10. When this allegation was made, I stated that:

(a) Amended Pretrial Order No. 13 affords complete protection for all documents falling within its ambit;

(b) IBM has at all times fully complied with the order and intends to continue to do so;

(c) I know of no instance in which IBM has failed to comply with the order; and

(d) If Itel has any information in any way tending to show that someone from IBM has failed to comply with the order, Itel should inform me forthwith.

11. Itel has never presented me with any such information.

12. In further response to Mr. Grutman, I stated that:

(a) IBM has need of discovery from Mr. Friedman because he has been designated as an intended trial witness by the Department of Justice, and because he has been so designated, IBM has every right to seek discovery from him; and

(b) Mr. Grutman's concern about highly confidential material being revealed in open court during Mr. Friedman's testimony was premature because the scope and direction of cross-examination would be entirely dependent upon what Mr. Friedman said on direct examination, and if he said nothing on direct which required cross-examination, there might be no cross-examination.

B. Paragraph 4 of the Affidavit of Jewel H. Bjork:

4. I have read the affidavit of Mr. Grutman, and inasmuch as I was present during the telephone conversations in question, I can confirm that the statements attributed to Mr. Shulman in Mr. Grutman's affidavit were in fact made by Mr. Shulman. During the course of the conversations, Mr. Shulman reported that he had consulted with his superiors in his lawfirm and I believe that he was conveying to us an official position with respect to the disposition of the motion. Mr. Shulman or his firm may now suggest other meanings or inferences to be attached to his statements, but at the time of the conversation there was no suggestion that Mr. Shulman was speaking in jest or banter.

C. Paragraph 3 of the Affidavit of Herman H. Howerton:

3. Since I was present for these telephone conversations, I can confirm that the statements attributed to Mr. Shulman in Mr. Grutman's affidavit were indeed made by Mr. Shulman. Moreover, Mr. Shulman stated in the course of the conversations that he had consulted with his superiors in the law firm and I believe that he was conveying to us an official position with respect to settlement of the motion. In addition, although only Mr. Shulman can say what he meant by his statements, he did not at the time of the conversations indicate in any way that such statements were anything but serious and I took them at their face value.

D. Paragraph 3 of the Affidavit of David N. Kuhn:

3. During the course of the conversations, Mr. Grutman, after consulting with and acting on instructions from Mr. Friedman, offered to have Itel Corporation stipulate as to any factual matters as it could with respect to IBM's cross examination requirements. Moreover, he

of IBM counsel, this court could not simply ignore those statements. Even if all doubts and differences were to be resolved in favor of IBM, those statements were improper, ill-advised, and had the clear tendency to harass and intimidate regardless of the intent of the speaker. Counsel have an obligation scrupulously to avoid both conduct intentionally intimidating and conduct which tends to have that effect. That obligation was not kept in the instant case.

In light of the conduct of counsel for IBM and in light of the nature of the production now sought, IBM's motion is denied except to the extent that it seeks production of post-1974 documents not within the five categories.[17] Further production by Itel, if any, will await the examination of Mr. Friedman before this court.

So ordered.

went so far as to offer to stipulate as to general factual matters with respect to the items deemed currently competitive and thus sensitive, leaving only the very essential particular details undisclosed. When Mr. Schulman [sic], after informing us he was acting after consulting with and on the advice of his superiors, finally declined to further explore our requests as to stipulations, Mr. Grutman asked Mr. Schulman [sic] whether Mr. Schulman [sic] could possibly suggest any stipulations which would resolve all or part of the controversy.

Mr. Schulman [sic], without stating he was speaking off the record and, so far as I could tell, without indicating he spoke in jest, stated that were Itel to stipulate that IBM had never harmed Itel and that IBM had not violated the anti-trust laws, then the entire matter might be obviated. On our response that we simply could not do that, the conversation concluded with the acknowledgment that we would then have to see each other in court.

17. See the fourth paragraph of this opinion.